William A. Paine et al., Trading as Paine, Webber & Co., Plaintiffs in Error, v. Sheridan Trust & Savings Bank, Defendant in Error.

Gen. No. 33,575.

Opinion filed December 31, 1929.

POPPENHUSEN, JOHNSTON, THOMPSON & COLE, for plaintiffs in error; FLOYD E. THOMPSON, of counsel.

KIRKLAND, FLEMING, GREEN & MARTIN, for defendant in error; WEYMOUTH KIRKLAND, CHARLES F. RATHBUN and WILLIAM H. SYMMES, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

In an action in assumpsit, commenced in the circuit court on June 25, 1927, to recover the proceeds of plaintiffs' check for $3,303.85, dated May 11, 1927, made pay-

able to defendant's order, and received by it in payment of a personal indebtedness of plaintiffs' defaulting cashier, there was a trial without a jury, resulting in the court entering a finding in defendant's favor. On April 15, 1929, judgment was entered on the finding against plaintiffs for costs, and subsequently they sued out the present writ of error.

Plaintiffs, copartners as Paine, Webber & Co., were engaged in a stock brokerage business in Chicago and elsewhere. Defendant was a corporation, doing a general banking business in Chicago. During May, 1927, and prior thereto, plaintiffs were acting as brokers for defendant and its customers in the buying and selling of securities. On May 11, 1927, and for several years prior thereto, plaintiffs had in their employ as cashiers in their Chicago office C. E. Carlson and J. J. Collum, who were known by defendant to be such. In December, 1926, Carlson, at the request of Collum, borrowed from defendant $5,500, giving his (Carlson's) note therefor, secured by the deposit with defendant of 600 shares of the preferred stock of the Julian Petroleum Corporation. Carlson borrowed said sum for the accommodation of Collum, and the stock, so deposited as security, was the property of Collum. About the same time Collum, who personally had a checking account with defendant, borrowed a like sum from defendant, pledging as security for his note an additional 600 shares of said stock. From time to time thereafter Collum made payments on *both* notes to defendant, usually in cash but on one or two occasions by his personal check. On May 10, 1927, there was due to defendant on *each* note a balance of $1,650, and the market value of the collateral thereto had so rapidly declined that defendant determined to call the loans. On that day Joseph H. Hartman, a note teller for defendant, notified Collum (but not Carlson) by telephone that the balance due on *both* notes, $3,300, together with accrued interest of $3.85, must be paid at

once. During this telephone conversation Collum said to Hartman that if defendant would deliver the two notes, and the stock deposited as collateral, to the "cashier's cage" in plaintiffs' Chicago office, he (Collum) would give defendant a check for the amount due on the notes. On the following morning, May 11, Hartman gave to a messenger of defendant the two notes, and the 1,200 shares of said stock, with instructions to deliver them to Collum at plaintiffs' office upon receipt of a check for $3,303.85. Later in the day the messenger returned with the check in question, which defendant accepted and applied the proceeds to the payment of the balance due on the two notes. The check is drawn by plaintiffs, viz., "Paine, Webber & Co.," by "Walter Brunton" and "C. E. Carlson." It is dated May 11, 1927, and it directs the drawee, the Standard Trust and Savings Bank of Chicago, to "pay to the order of Sheridan Trust and Savings Bank" (defendant) the sum of $3,303.85. On the back is the indorsement "Sheridan, May 11, 1927"; and the further indorsement, "Sheridan Trust and Savings Bank; paid through Chicago Clearing House, May 13, 1927." Perforated through the check are the words and figures: "Paid, 5–13–27." Hartman testified that the first of these indorsements means that defendant received the check on May 11th; and that the second indorsement and the perforations mean that the check reached the clearing house on May 13, and was on that day presented to and paid by the drawee bank.

Neither when defendant accepted the check, nor before it received the proceeds thereof, did it make any inquiry as to Collum's authority to use a check of plaintiffs to pay his personal indebtedness. On May 11, plaintiffs did not owe defendant $3,303.85, but they did owe it the sum of $1,058.97, which sum they paid on the same day by another check, also accepted by defendant. We find no evidence in the record tending to show that Collum had authority to use plaintiffs' funds to pay his

personal indebtedness, or that plaintiffs ever said or did anything which could have led defendant to believe that Collum had any such authority. The evidence discloses that Carlson and Collum each had authority to draft and sign checks in payment of *plaintiffs'* obligations. Such checks, however, were required to be signed also by *either* M. J. O'Brien (a resident co-partner of plaintiffs' firm) or Walter Brunton (plaintiffs' head bookkeeper) or C. J. Bridgen (plaintiffs' office manager.) The evidence further discloses that Collum drafted the check in question, that he entered in the check register a false statement that the check was issued ''in payment of 100 shares of Warner A'' stock, that he obtained the signatures of Carlson and Brunton on the check by misrepresentations, and that as cashier he drew many of plaintiffs' checks each day. Brunton testified that, as head bookkeeper, he was accustomed to sign 100 to 150 checks every business day, that when he signed the check in question there ''was nothing to attract my attention to it particularly,'' and that he did not then have any knowledge or suspicion of Collum's misappropriations or embezzlements, as were exposed shortly thereafter. The evidence further discloses that prior to May 11, 1927, Collum had abused his authority to draft and sign checks and had embezzled large sums of plaintiffs' money, that by making false entries he had concealed his misappropriations, but that, on May 11, no one connected with plaintiffs' Chicago office had any knowledge or suspicion of these facts and Collum then was a trusted employee. On that day an audit of the accounts of plaintiffs' Chicago office was in progress, in charge of one Kelly, who, during the forenoon of May 12, discovered an irregularity in Collum's accounts and who advised O'Brien thereof, and an investigation was immediately commenced. On the afternoon of May 13, during the progress of the investigation, Collum confessed to O'Brien that he was short in his accounts. Several days were consumed in

the checking of accounts, etc., and finally the giving of the check in question, not in payment of any "Warner A" or other stock but in payment of Collum's personal indebtedness to defendant, was discovered. On June 6, 1927, plaintiffs' attorneys by letter advised defendant of the discovery and requested information "as to the circumstances under which this check was used by Collum to pay his personal obligation." About this time plaintiffs demanded of defendant that it return to them the proceeds of the check, $3,303.85, which demand defendant refused, and on June 25, 1927, plaintiffs commenced the present action.

Counsel for plaintiffs here contend that the trial court erred in entering a judgment against plaintiffs; and that, under the undisputed material facts, the court should have found the issues in plaintiffs' favor and entered a judgment against defendant for the face amount of the check, together with legal interest thereon from June 6, 1927. And counsel argue, in substance, that the decision in the case at bar is controlled by the law of agency; that when defendant accepted plaintiffs' check from Collum in payment of his and Carlson's personal indebtedness to it, without making any inquiry as to Collum's authority to so pay such indebtedness with plaintiffs' funds, defendant acted at its peril; that the check itself was sufficient notice to require such an inquiry, and constituted a warning to defendant that the check was not the property of Collum; that when defendant received the check, then knowing that plaintiffs were not indebted to it in the sum of $3,303.85, it became its duty either to return the check or to collect the amount of it and hold the proceeds subject to plaintiffs' order; that defendant cannot be considered to be an innocent party, and that the well known rule, that where one of two innocent parties must suffer, the one who has put it in the power of a third party to cause a loss must bear it, is not applicable to the facts of the present case: and that no estop-

pel can properly arise against plaintiffs because of their claimed negligence in their method of conducting business and issuing checks, and for the reason that such negligence (if any there was), did not induce defendant to accept the proceeds of plaintiffs' check.

After considering the evidence and after reviewing many adjudicated cases, we are of the opinion that the contention and arguments of counsel are sound, that the judgment of the trial court against plaintiffs cannot stand, and that they are entitled in this court to a judgment against defendant for the amount of the check, $3,303.85, with legal interest thereon from June 6, 1927.

We agree with plaintiff's counsel that the present case is to be decided under well settled principles of the law of agency. In *Merchants' Nat. Bank v. Nichols & Shepard Co.,* 223 Ill. 41, 49, it said: "It is to be remembered that persons dealing with an assumed agent are bound, at their peril, to ascertain not only the fact of the agency, but the extent of the agent's authority. They are put upon their guard by the very fact that they are dealing with an agent, and must, at their peril, see to it that the act done by him is within his power. . . . An agent cannot confer power upon himself, and therefore his agency or authority cannot be established by showing either what he said or did." In *Hurley v. Watson,* 68 Mich. 531, 537, it is said: "The duty of the defendant to make inquiry in this case, notwithstanding the apparent general management of plaintiff's business by Clark, is conclusively established by another well-recognized principle of law, and that is, that a party dealing with an agent who has general authority to sell goods or collect debts is bound to know that the agent has no authority by virtue of his agency to apply or offset his own private debt to such third party in payment of the debt to the principal. . . . No overweening confidence of the principal in the agent can excuse the duty of the third

party to ascertain whether the agent has authority from his principal to pay the agent's debts in that way. It is presumptively a violation of the agent's authority, and a fraud upon his principal, and the party collecting his debt from the agent in that way participates in the fraud, and cannot shield himself behind any presumed or implied authority of the agent, because none exists in such case. The party so dealing takes upon himself the burthen of showing an express authority in the agent, or ratification of the transaction by the principal." In *Farrington v. South Boston R. Co.,* 150 Mass. 406, plaintiff took in pledge a certificate of some shares of stock of defendant corporation, as security to him for the personal debt of Reed, defendant's treasurer. Reed, by fraud, had caused the certificate to be issued in plaintiff's name. It was held that plaintiff could not be protected as an innocent holder for value of the certificate. The court said (pp. 409–10): "An agent cannot properly act for his principal and himself when their interests are adverse, and any person dealing with an agent in a matter affecting his principal, and knowing that the interests of the agent are adverse to those of his principal, ought to be held to the duty of ascertaining that the acts of the agent are authorized by his principal. . . . We are of the opinion that the facts were such that the plaintiff was reasonably put upon inquiry as to the title of Reed to the certificate of stock which he undertook to pledge, and that the plaintiff is to be affected with notice of whatever he might have found out, if he had made proper inquiry. . . . The plaintiff cannot rely upon any representations of Reed, because he knew that Reed was acting for himself in borrowing the money and in pledging the stock." In *City of Newburyport v. Fidelity Mut. Life Ins. Co.,* 197 Mass. 596, in an action for money had and received, the city recovered a judgment against the insurance company for the amount of six checks, drawn without authority by

the city's treasurer on its funds in a bank, and paid to the insurance company as premiums for six successive years upon a life policy issued to said treasurer. In affirming the judgment the reviewing court said (pp. 602–3): "The checks were on their face the checks of the plaintiff, a municipal corporation. . . . The defendant therefore must be held to have known this; and it knew further that they were delivered to the defendant in payment of the individual debt of the treasurer. In short, the defendant *knew* that it was receiving in payment of the individual debt of the treasurer checks of the municipal corporation, and therefore that *upon the face of the transaction* the treasurer was using the funds of the city to pay his own debt. No citation of authorities is needed in support of the proposition that in the absence of proof of authority on the part of the treasurer such a check is invalid. The payee is charged with notice of a possible want of authority on the part of the agent or officer to bind the principal, and cannot recover upon the check or retain the proceeds without showing that the execution of the paper was duly authorized." (See, also, *Rothstein v. Grossberg,* 303 Ill. 619, 622–3; *Bowles Co. v. Clark,* 59 Wash. 336, 339; *Anderson v. Kissam,* 35 Fed. 699, 703; *Lamson v. Beard,* 94 Fed. Rep. 30, 42–3; *St. Charles Sav. Bank v. Edwards,* 243 Mo. 553, 564; *Sims v. United States Trust Co.,* 103 N. Y. 472, 475–6; *Gerard v. McCormick,* 130 N. Y. 261, 267–8.)

The facts in *Milano v. Sheridan Trust & Sav. Bank,* 242 Ill. App. 362, are similar to those in the present case. There plaintiffs were employees of L. Klein & Co. (who conducted a department store in Chicago) and had organized themselves as an association, known as "L. Klein Employees' Savings and Loan Association." In August, 1922, the association drew a check on its account with a Chicago bank for $750, payable to the order of the defendant bank, and delivered the check to one Tresidder, bookkeeper and auditor of the

association, with instructions to purchase certain bonds for the association from the defendant bank. Tresidder, who was a customer and depositor of said bank, mailed the check together with a deposit slip and requested that the check be credited to his individual account. The bank did this and in due course collected the proceeds through the clearing house from the drawee bank. In January, 1923, the association delivered to Tresidder another similar check for $1,500, giving him like instructions and the check took the same course. On neither occasion did Tresidder purchase any bonds for the association as instructed, but the proceeds of the checks were converted to his personal use. The association had no knowledge of these transactions until about May 2, 1923, when it demanded of the bank that it pay to the association the proceeds of the two checks, aggregating $2,250, together with legal interest, but the demand was refused and thereafter the suit was brought. When the bank received the two checks it did not then, or at any other time, make any inquiry of the association, or of any person, as to the authority of Tresidder to deposit the checks to his said personal account. Prior to May 2, Tresidder had withdrawn all moneys on deposit in his account, including the proceeds of said checks, except the sum of $7.74. On the trial without a jury, upon stipulated facts, the court gave judgment against the bank for only $7.74. On writ of error the First Division of this Appellate Court reversed said judgment and entered a judgment against the bank for $2,652.18. This sum is made up of the aggregate amount of the two checks, $2,250, and legal interest thereon from May 2, 1923, when the association made the demand for the return of said aggregate amount. Our Supreme Court denied the bank's application for a writ of certiorari (242 Ill. App. xiv). The Appellate Court in its opinion held (p. 370) that "the weight of authority and reasoning support the position of plaintiffs and that the bank,

in neglecting to hold the proceeds of the checks subject to the directions of the plaintiffs and in permitting Tresidder, a third party, to withdraw the amount, was negligent and in law did not take the checks in good faith.'' The court in the course of its opinion further said (p. 367):

''We have concluded that, as the checks upon their face showed that they were drawn by the association to the order of the defendant, with which the association had no account and to which it was not indebted, it became the duty of the bank, if it accepted said checks, to collect the proceeds thereof and hold the same subject to the order of the association, and that the bank was negligent in crediting the proceeds of said checks to the personal account of Tresidder.''

The bank's counsel strenuously contend that the present judgment in its favor should be affirmed, because the bank, the payee of the check in question, was a holder in due course without notice of any infirmity or defect in it through the default of Collum, or for any other reason,'' and that, hence, the bank ''was legally entitled to take the check for Collum's indebtedness to it.'' To support the contention great reliance is placed upon the holdings and decision in the case of *Drumm Const. Co. v. Forbes,* 305 Ill. 303 (affirming 224 Ill. App. 271.) But we think the facts in the *Drumm* case are to be distinguished from those of the present case. The *Drumm* case also was relied upon by the defendant bank in the *Milano* case, *supra,* but was there distinguished, the Appellate Court saying (p. 369):

''But it is said that under the Negotiable Instruments Act the bank took the checks in good faith and for value, without notice of any infirmity in the instrument or defect in the title of the person negotiating it, . . . and that therefore it is a holder in due course and will be protected. In *Drumm Const. Co. v. Forbes,* 305 Ill. 303, it was held that Forbes, the payee in the

check, took it in due course and was protected from any infirmity in the title of Lamberton, who gave it to him, and that the plaintiff, who drew the check, could not recover from Forbes. But this case can be clearly distinguished from the one at bar, in that Lamberton was indebted to Forbes, who took the check, which was drawn for the exact amount of this indebtedness, in discharge and payment of the same. It was a private transaction between individuals. Forbes was not in the banking business and did not receive funds for deposit. The present Negotiable Instruments Act has not voided the requirement of good faith by the acceptor of commercial paper.''

And from the Supreme Court's opinion in the *Drumm* case, another feature, distinguishing that case from the present one, appears. The court says (p. 308): ''The check here in question was complete when Forbes received it from Lamberton, and there *was nothing in the character of the instrument* to charge him with knowledge of any infirmity or put him on inquiry.'' In the present case we think that the check itself, together with the transaction, were sufficient to put the defendant bank upon inquiry. The check, drawn by plaintiffs, was payable to the order of the bank, to which plaintiffs were not then indebted to the amount of the check. And the check was delivered to the bank by Collum, known by the bank to be an agent and cashier of plaintiffs' with limited authority, in payment of his personal indebtedness to the bank, and was accepted by the bank in discharge thereof.

The bank's counsel further contend that the bank ''was an innocent party in the case, and, as plaintiffs put it in the power of Collum to commit the act; they must bear the loss.'' We cannot agree with counsel that the bank was an innocent party in the transaction, or that the ''two innocent parties'' rule has any application under the facts herein in favor of the bank. (*St. Charles Sav. Bank v. Edwards,* 243 Mo. 553, 570;

*Quincy Mut. Fire Ins. Co. v. International Trust Co.,*
217 Mass. 370, 374.) And we do not think that plain-
tiffs' claimed negligence, if any there was, in their
method of conducting business and issuing checks, and
in not discovering Collum's misappropriations before
they did discover them, should militate against their
recovering from the bank the amount of the check in
question, by way of estoppel or otherwise. (*People v.
Bank of North America,* 75 N. Y. 547, 561; *Merchants
Nat. Bank v. Nichols & Shepard Co.,* 223 Ill. 41, 53;
*Wheeler v. McGuire,* 86 Ala. 398.) In the last cited
case it is said (p. 406): "Though mere negligence,
mere want of ordinary diligence, may furnish the agent
an opportunity of undue assumption of authority, it
does not, of itself, work an estoppel. A principal is
not required to distrust his agent, nor to keep a vigi-
lant watch over the manner in which he exercises his
authority and to see that his instructions are obeyed.
He may act on the presumption that third parties, deal-
ing with his agent, will not be negligent in ascertaining
the extent of his authority, as well as the existence of
his agency."

The judgment of the circuit court against plaintiffs
is reversed and judgment will be entered here in their
favor and against the defendant bank for $3,303.85
(the amount of the check in question), plus interest
thereon at the rate of 5 per cent per annum from
June 6, 1927, to the date this opinion is filed, which
interest will be computed by the clerk of this court.

*Reversed with finding of facts, and judgment here
against defendant for $3,303.85, plus interest thereon
at the rate of 5 per cent per annum from June 6, 1927.*

BARNES, P. J., and SCANLAN, J., concur.

We find as facts in this case that Collum, plaintiffs'
agent and cashier, was not authorized by plaintiffs to
use their funds to pay a personal indebtedness of his,
and that he was not authorized by them to issue their

said check for $3,303.85, payable to the order of defendant bank and to deliver the same to said bank in liquidation of an indebtedness then owing to said bank by him, or by him and Carlson; that defendant bank had notice or was put upon notice of these facts; that plaintiffs never by word, act or deed advised defendant bank, or in any way held out to the bank, that Collum had any such authority; and that plaintiffs never ratified Collum's acts in issuing and delivering said check.